IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL No. 15-398-3 |
| WAYDE MCKELVY, | : | |
| Defendant | : | |

MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
PURSUANT TO FED.R.CRIM.P. 29(c)

Defendant Wayde McKelvy, by his attorneys, Walter S. Batty, Jr. and William J. Murray, Jr., submits this Memorandum in Support of Defendant's Motion for Judgment of Acquittal Pursuant to Fed.R.Crim.P. 29(c).

I. Legal standards. The legal standards for a motion under Rule 29(c) ("After Jury Verdict"), are set out in United States v. Glenn, 2018 WL 4091788 (E.D.Pa. 2018)(Slomsky, J):

> Under Rule 29 …, a defendant may file a motion for judgment of acquittal based on insufficient evidence presented at trial …. When considering a Rule 29 motion, a court must view the evidence and the reasonable inferences drawn in the light most favorable to the Government to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the evidence presented. United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001). In doing so, a court must make all reasonable references in favor of the jury's verdict. United States v. Lore, 430 F.3d 190, 205 (3d. Cir. 2005); United States v. Salahuddin, 765 F.3d 329, 348 (3d Cir. 2014). Furthermore, a court may conclude that there was sufficient evidence to sustain a conviction, even if based on circumstantial evidence. United States v. Bortnick, Crim. A. 03-CR-0414, 2005 WL 1693924, at *4 (E.D. Pa. Jul. 20, 2005).
>
> Therefore, it follows that a finding of insufficient evidence should only be made in situations where the

> Government clearly failed to prove its case beyond a reasonable doubt. United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (citing United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)). Courts must take caution to avoid "usurp[ing] the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (citing United States v. Jannotti, 673 F.2d 578, 581 (3d Cir. 1982)).

Id. at *7.

II. The government's "first rationale" under section 3293(2).

A. Relevant statutes. Although it is accurate that much of this analysis is copied and pasted from prior memos, our position has been strengthened by the evidence offered at trial.

McKelvy argues that the traditional five-year statute of limitations is applicable in this case and that, accordingly, Counts 1-8 should be dismissed. The government's position, throughout this litigation, has been that the applicable statute of limitations is 18 U.S.C. § 3293(2).

Section 3293(2) provides a ten-year statute of limitations for the crimes charged in Count 1, the wire fraud conspiracy count, and Counts 2-8, the wire fraud substantive counts, "if [each] offense affects a financial institution." Cf. United States v. Anthony Allen, 160 F.Supp.3d 698, 705 (S.D.N.Y. 2016).

As used in section 3293(2), the term "financial institution" is defined in 18 U.S.C. § 20(10)[1] as follows:

> As used in this title, the term "financial institution" means --
>
> (1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);
>
> … or

---

[1] Section 20(10) was added, by an amendment to section 20, on May 20, 2009.

> (10) a mortgage lending business (as defined in section 27 of this title) ….

As stated in <u>United States v. Cardillo</u>, 2015 WL 3409324 (D.N.J. 2015), "In 2009, Congress amended the definition of 'financial institution,'" as set out above in section 20(10), to include "a mortgage lending business (as defined in section 27)."  Section 27, in turn, states, "In this title, the term 'mortgage lending business' means an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies …, and whose activities affect interstate or foreign commerce."

The government has offered a first and second rationale as to why section 3293(2) is applicable here.

    B. <u>The government's first rationale – factual anaylsis</u>.
The first rationale is that Mantria Financial, which was initially set up to issue mortgages on land sold by Mantria in Tennessee, see Count 1, ¶ 5, later went bankrupt as a result of the fraud scheme.  Doc. No. 113 at 9.  The indictment alleges that "Mantria Financial was a financial institution and mortgage lending business which engaged in interstate commerce." Id.  McKelvy responds that the government has not established, beyond a reasonable doubt,[2] that Mantria Financial qualified as such.[3]

---

[2] The Third Circuit approved the district court's instruction in <u>United States v. Pelullo</u>, 964 F.2d 193, 215-16 (3d Cir. 2012), that, "Before the defendant can be found guilty of the wire fraud violation [in Counts 1-53] you must find that the Government has established beyond a reasonable doubt that the defendant engaged in a fraudulent scheme that effected [sic] [a federally-insured] savings and [l]oan."  It was understood that American Savings and Loan was a federally-insured institution; the defendant argued that its wholly-owned subsidiary, FCA Mortgage, was not.  Although the defendant engaged in fraudulent representations to FCA, he was convicted for his involvement in defrauding FCA's parent, American, which was federally insured.

[3] McKelvy argues below that, even if Mantria Financial were a financial institution within the meaning of section 3293(2), the government has not shown that Mantria Financial was "affected" – as that term is used in the case law – by the alleged fraud.

It cannot be over-emphasized that, as to any arguments by McKelvy challenging the applicability of the extended statute, it is the government's burden – beyond a reasonable doubt – to refute the defense arguments, rather than the defendant's burden to establish anything.  McKelvy argues that the government's failures on this requirement are multiple ones.

The only evidence which the government has submitted in support of the allegation in the indictment that Mantria Financial was a "financial institution" is the testimony of Carl Scott, the Director of Licensing for the Tennessee Department of Financial Institutions ("TDFI").  Scott testified that the paper records of the two applications by Mantria Financial to be licensed by the TDFI had been destroyed in accordance with the agency's document management policies.

Scott testified that, according to a "screenshot" of prior transactions, CS-2, Mantria Financial's first application for a license as a financial institution was submitted on 11/13/07 and that this application was granted, with the issuance of such a license on 2/5/08 and that this license expired on 6/30/08. Scott further testified that the initial license was renewed, for the period 7/1/08 through 6/30/09.  There were no details in the screenshot as to the contents of these two applications.[4] Scott also testified about what appears to have been the third application[5] - for which there was a digital copy, AK-16, which was notarized on May 19, 2019.  McKelvy argues that the two financial statements attached to AK-16, even though purportedly supporting the third application are relevant to the second application, which governs the period 7/1/08 through 6/30/09 because they are dated as of two dates within that period. In the following sections, McKelvy will discuss the testimony of several different trial witnesses.

    C. <u>Mantria Financial's failure to satisfy the $25,000 net worth requirement is disqualifying</u>.  At trial, Marcum forensic

---

[4] McKelvy has received a partial transcript of Scott's testimony which, as the Court knows, was incomplete, due to an ESR malfunction.

[5] This third application, submitted on 5/19/09, is sometimes referred to on cross as the second application.

accountant Kyle Midkiff testified as a defense witness.  Midkiff stated that the TDFI had a minimum net worth requirement for mortgage lending companies, such as Mantria Financial, of $25,000.  Midkiff stated that, according to the Notes to its Financial Statement dated December 31, 2007, Mantria Financial, LLC was formed in October 31, 2007.  Based on her examination of its books and records, Mantria Financial was not in compliance with this requirement at least as of August 31, 2008, through December 31, 2008.  During her testimony, Midkiff stated:

-- According to the balance sheet that was part of the Financial Statement dated December 31, 2007, Mantria Financial met, as of December 31, 2007, the net worth requirement of $25,000, set by the TDFI.

-- An income statement for Mantria Financial for eight months ended August 31, 2008 prepared by Granoff reflects a loss on operations of $1,861,016. Government Exhibit SG-10.  The same financial statement also reflects a $1,860,000 capital contribution, which appeared to offset the loss.

-- A balance sheet and income statement for Mantria Financial for the year ended December 31, 2008 was prepared by witness Steven Granoff in May 2009 in connection with Mantria Financial's TDFI license renewal. Defense Exhibit SG1 at 4-5.

-- Because all of the funds received by Mantria Financial from investors was in the form of debt ($23,409,953), Mantria Financial's debt exceeded their equity by 71 times at December 31, 2008 ($23,571,953 of total liabilities including accounts payable and investor liabilities, compared to equity of $330,411).  The income statement for Mantria Financial for the year ended December 31, 2008 reflects a loss of $4,194,589 for year ended December 31, 2008. Defense Exhibit SG1 at 5.

-- In order to achieve equity of $330,411, this financial statement reflects a $4,500,000 capital contribution, which is based on a "stock subscription receivable – Mantria Corp." that offsets the loss. Defense Exhibit SG1 at 4-5. This capital contribution is similar to the capital contribution appearing on Mantria Financial's financial statement for the eight months ended August 31, 2008.

-- Normally, there would be a stock subscription agreement and perhaps some explanations or journal entries in the general ledger of a company to support such an entry, but there were no such documents here.

-- A May 18, 2009 e-mail, Defense Exhibit SG2, from Dan Rink which forwards the financial statements prepared by Granoff to Troy Wragg, states the following:

> Here is a draft of the MF financials for 2008. In order to have an ending equity in excess of $25,000, we have added a Subscriptions Receivable account for $4.5M. This yields about $300K in equity. Please consider this carefully as we need to do something like this. Without this equity deficit would be something like $4M ….

-- Midkiff identified and explained Chart 1, which was marked as Defense Exhibit D-264, attached, shows assets, liabilities and equity with the subscription receivable; the equity is positive.

-- Midkiff identified and explained Chart 2, which was marked as Defense Exhibit D-265, attached, shows assets, liabilities and equity without the subscription receivable; the equity is negative.

-- Midkiff identified and explained Chart 3, which was marked as Defense Exhibit D-266, attached, shows equity with and without subscription receivable.

-- It was Midkiff's understanding that the $25,000 net worth requirement was an ongoing requirement. Midkiff's opinion, within a reasonable degree of professional certainty, was that Mantria Financial did not meet the net worth requirements set by the TDFI as of 8/31/08 and 12/31/08 (which were the statements used for its renewal application). The government asked no questions on cross.

With reference to the AK-16, which apparently was Mantria Financial's third application, Scott stated as follows, in response to defense questions on cross:

> Q Okay. If on an application, initial application or a renewal application false information is provided about the

>   ownership of the entity seeking licensing or registration, would that impact the -- granting the license?
>
>   A Yes, sir.
>
>   Q And in what respect?
>
>   A We would deny it.
>
>   Q And if you learned after the fact that false information had been submitted in an application, you would deny that.
>
>   A Yes, sir.
>
>   Q That, in your view, your agency's view, the ownership interest is important material information.
>
>   A Yes, sir.
>
>   Q You want to know who you're doing business with --
>
>   A Right.

Although these answers by Scott dealt with "the ownership of the entity seeking licensing," there is a clear inference that Mantria Financial's false information about its net worth figures is equally material and equally disqualifying, because it deals with the TDFI's minimum requirement for the financial stability of the firm.[6]  Once again, it is the government's burden, beyond a reasonable doubt, to disprove the testimony of Midkiff and Scott.

McKelvy argues that Midkiff's testimony meant that Mantria Financial was out of compliance with the net worth requirement for the period August 31, 2008 until the end of that certification period, June 30, 2009, and, accordingly, that Mantria Financial was not a "financial institution," within the meaning of Tennessee law.  Accordingly, for that time period, Mantria Financial was not entitled to the protection of the extended statute of limitations, section 3293(2).

---

[6]  McKelvy will respond below to the government's argument at trial that, under section 3293(2), Scott's testimony - that Mantria Financial would have been disqualified if caught earlier - is not relevant to the applicability of this section.

**D. Knorr's false assertion of a 51% interest in Mantria Financial is disqualifying.** On what appears to have been the third application[7] - for which there was a digital copy, AK-16 - Scott said that there is a line on this form which directs the applicant to "identify all parties owning over 5 percent interest in the application." He further testified that that space shows (in hand-printing), "Amanda Knorr 51 percent, Troy Wragg 49 percent."

With reference to the AK-16, which is apparently Mantria Financial's third application, Scott stated as follows, in response to defense questions on cross:

> Q Okay. If on an application, initial application or a renewal application false information is provided about the ownership of the entity seeking licensing or registration, would that impact the -- granting the license?
>
> A Yes, sir.
>
> Q And in what respect?
>
> A We would deny it.

McKelvy submits that the evidence is clear that Mantria Financial was 100% owned by Mantria Corp and that the entry concerning the 51%/49% ownership split between Knorr and Wragg was entirely false and that had TDFI known the truth, Mantria Financial's applications would have been denied.

As to the question of whether the ownership-percentages of owners of Mantria Financial on the TDFI license application form in effect for the third application were also in effect at time of Mantria Financial's initial application in November 2007, the following exchange took place between defense counsel and Scott:

> Q The ownership interest in entities that are being licensed and certified, is that the type of information that would be recorded anywhere else in your agency's records?

---

[7] This third application, submitted on 5/19/09, is sometimes referred to on cross as the second application.

> A Should have been on the original application, sir, but since I don't have that.
>
> Q The original application, does the original application request information similar to this --
>
> A Yes, sir.

Accordingly, from Scott's testimony, it is apparent that Mantria Financial would have been disqualified as the mortgage lender if the TDFI had known the truth at the time that the AK-16 application was filed. It is also apparent that the initial application, apparently submitted on November 13, 2007, contained a request for ownership information.

The only remaining issue as to the initial application is whether the government has proved, beyond a reasonable doubt, that the representations made on the initial application form told the truth – that Mantria Corp. was the 100% owner of Mantria Financial. McKelvy argues that the only logical conclusion, after reviewing the claim in Mantria Financial press release, Government Exhibit AK-14DX, includes a press release from Mantria Corp., dated March 27, 2008, claiming that "Mantria Financial is a minority-owned business, with 51% controlled by Chief Operating Officer Amanda Knorr …."

Neither Knorr nor any other government witness said that the initial form contained accurate information on the ownership issue. Instead, Knorr, on cross, seemed to say that she thought she was the 51% owner of Mantria Financial.

As such, the government has failed to carry its burden of establishing that, had the TDFI known the true facts, it still would have issued the license to Mantria Financial as a mortgage lender.

F. <u>The government's attempt to sidestep the defense arguments on the first rationale are unavailing</u>. At trial, when confronted with McKelvy's evidence and arguments on the first rationale, as summarized above, the government advanced an approach which was belied by the allegations in the indictment, the allegations in the government's central pre-trial memo on the limitations issue, as well as by the language of the applicable statutes: that McKelvy's contentions were unimportant because having a

state license is not an element of the statutory definition of a financial institution under section 3293(2).

The only financial institution named by the government in the indictment was Mantria Financial and its status as a financial institution is specifically tied there to the license to finance real estate mortgages in Tennessee:

> Mantria Financial was a financial institution and mortgage lending business which engaged in interstate commerce. Mantria Financial was licensed in Tennessee to finance real estate mortgages.

Id. at ¶ 5.  Moreover, in its Response, Doc. No. 113, to McKelvy's Amended Limitations Motion, the government used language which echoed the allegations in the indictment: "Wragg created Mantria Financial, which was a bank [sic] financial institution licensed to lend money under Tennessee law."  Id. at 8.

To summarize the pertinent statutes, 18 U.S.C. § 3293(2), which extends the regular five-year statute of limitations to ten years in wire fraud prosecutions where the government can prove that a defendant willfully participated in an offense which "affect[ed] a financial institution."  The term "financial institution," as defined in 18 U.S.C. § 20(10), includes "a mortgage lending business (as defined in section 27)."  Section 27, in turn, states, "In this title, the term 'mortgage lending business' means an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies …, and whose activities affect interstate or foreign commerce."

Accordingly, while the applicable statutes do not require a "mortgage lending business" to be licensed under state law, they do require that such a "business" "finances or refinances any debt secured by an interest in real estate, including private mortgage companies" – in other words, the statues require that a "mortgage lending business" issues mortgages.  After numerous repetitions of the statutory requirements in McKelvy's memos, the government somehow forgets that it has to show beyond a reasonable doubt, on the first rationale, that Mantria Financial issues mortgages.  It was Troy Wragg and Chris Flannery who

decided that Mantria Financial should be created in Tennessee, to serve buyers of Mantria's properties there.  As was made clear by Scott's testimony, to issue mortgages in the state of Tennessee, a business has to apply to the TDFI, meeting the requirements discussed above.

It is irrelevant whether Mantria Financial could have been created in another state where there were no licensing requirements; the facts remain that Mantria Financial decided to locate in Tennessee and issued its purported mortgages there.  As such, on this point, it is now known that the "mortgages" issued by Mantria Financial were fraudulently-obtained and, by necessity, invalid. In effect, the government now argues that invalid mortgages were still "mortgages," for purposes of the statutes mentioned above.  On its face, such an argument is not a defensible one.

G. <u>Mantria and Mantria Financial were not adversely affected by the fraud</u>.  McKelvy also argues that, while there were numerous assertive representations by the government regarding the issue of whether or not Mantria Financial had been "affected" by the fraud, there was not even a scintilla of evidence to support any of these allegations.  Although government witnesses, on direct, testified numerous times that Mantria was on the verge of bankruptcy before McKelvy started raising funds for them; that Mantria lost money on each sale of a lot in Tennessee; and that, except for something less than $300,000 in lot sales, Mantria's only source for paying, among other things, the out-sized payroll, was investor funds, the government's apparent strategy to pre-empt the defendant's frequently-repeated position does not take from McKelvy's argument that these facts, alone, show that Mantria – and by necessity Mantria Financial - was not adversely affected by the fraud.

III. <u>The government's "second rationale" under section 3293(2)</u>.

As to the government's second rationale for invoking section 3293(2), there are only three government witnesses who made reference to their having had a financial relationship with a federally insured bank[8]: Dee Holl, Charles Carty, and Phil Wahl.

---

[8] McKelvy concedes, of course, that any FDIC-insured bank which issued credit cards which were identified as being in force

McKelvy argues that, as a matter of law, the government has not proved, beyond a reasonable doubt, any of the requirements of the case law as to whether a financial institution had been adversely "affected" because it had suffered an actual loss or a substantial new or increased risk of loss.

Of these three witnesses, only Holl testified about a federally insured bank having any actual loss or a substantial new or increased risk of loss. She stated that she had defaulted on approximately $23,000 of credit card debt with an unspecified lender.⁹ But, as set out in our Amended Limitations Memo, Doc. No. 105, under section 3293(2), the government's evidence must show the "affected" element of section 3293(2) was not too remote from the fraud. See United States v. Pelullo, 964 F.2d 193, 215-16 (3d Cir. 2012).

Under section 3293(2), the government must produce sufficiently detailed evidence to provide facts which withstand the statute of limitations defense. See United States v. Carollo ("Carollo II"), 2011 WL 5023241, *3 (S.D.N.Y. Oct. 20, 2011). Section 3293(2) "broadly applies to any act of wire fraud which affects a financial institution," provided the effect of the fraud is "sufficiently direct," see United States v. Heinz, 790 F.3d 365, 367 (2d Cir. 2015), cert. denied, 136 S.Ct. 801 (2016) (citing United States v. Bouyea, 152 F.3d 192, 195 (2d Cir. 1998) (per curiam) (quotation marks omitted); cf. United States v. Bogucki, 316 F.Supp.3d 1177, 1189 (N.D.CA. 2018)(scholarly opinion noting that, as to the "directness of harm" issue, the court in United States v. Ohle, 678 F.Supp.2d 215, 228–29 (S.D.N.Y. 2010), ruled that the losses were "a direct and foreseeable result of the [defendant's] conspiracy.").

Here, even though the jury could have reasonably concluded that the government proved that one of the reasons Holl experienced a

---

during the period when the defendant marketed the various Mantria investments at issue in this case would qualify as a "financial institution" under section 3293(2).

⁹ Neither co-counsel's notes reflect the identity of the lender as to which Holl said that she defaulted approximately $23,000. If the transcript shows, in fact, that no FDIC-insured lender was referred by her, that would be a failure of proof.

$23,000 loss on her credit card(s) was Mantria's not paying her the promised returns on her investments, this loss, as a matter of law, cannot be said to have been a "direct and foreseeable result," cf. Ohle, 678 F.Supp.2d at 229, of the fraud because Holl testified that the reason for the default was that she had lost her job for two years and was not able to keep up with the payments on the credit card.[10]  McKelvy argues that, no matter how Holl's testimony is construed, the witness did not provide any evidence to suggest that job loss for two years came as a result of her investments in Mantria.  Accordingly, there was no evidence of their having been a direct effect of the fraud on any FDIC-insured bank.[11]

Similarly, as to Carty and Wahl, the government has not provided a detailed explanation that any risk of loss was "new or increased" or that it was "substantial."  Court's Instructions at 75; see United States v. Serpico, 320 F.3d 691, 694-95 (7th Cir. 2003); United States v. Ghavami, 2012 WL 2878126, *5 (S.D.N.Y. 2012), citing United States v. Mullins, 613 F.3d 1273, 1278 (10th Cir. 2010); United States v. Rubin/Chambers, Dunhill Ins. Services (CDR), 831 F.Supp.2d 779, 783-84 (S.D.N.Y. 2011).  Neither Carty nor Wahl testified that he had defaulted or was at risk of defaulting on any of his loans from or credit cards with federally-insured banks.  Carty testified that he invested in Mantria $25,000 taken from a homeowner's line of equity ("HELOC") at the federally-insured Minnequa Works National Credit Union; but it appears that, while he had been making payments on the $25,000 withdrawal, he did not testify to a default or a risk of default. Likewise, although the government provided counsel with photocopies of five of the witness's current credit cards with federally-insured banks, Wahl did not

---

[10]  This statement is taken from co-counsel Batty's notes.  The transcript, of course, may show that Holl's testimony was more nuanced.  While Holl also testified that McKelvy urged Holl and other potential investors to open credit cards in business names and although Brook Fain was listed several times as a potential government witness he was, in fact, not called.

[11]  Although there is no doubt that the impact of the fraud on the individual investors was severe, the question of any impact on a specific FDIC-insured bank is a different matter, of course.

mention anything about a default or risk of default on any of the credit cards he used in 2008-09 for cash advances.

It follows from this that there could not have been, as a matter of law, any risk of loss to a federally insured bank, other than the same risk which is a part of every issuance of every HELOC and every credit card.  Up to now, the government's apparent position has been that, anytime any investor used funds from a federally-insured bank to invest in Mantria, there was automatically a substantial new or increased risk of loss to that bank.  Any such construction of section 3293(2) would, in effect, mean that the "affected" requirement of the statute was meaningless.

Moreover, there is no way of knowing whether there was a substantial, as opposed to <u>de minimis</u>, risk of loss, because the government made no effort whatsoever to explain Carty's or Wahl's circumstances concerning any such risk, as McKelvy argued in Doc. No. 105 at 52-55, Doc. No. 121 at 38-41.

Accordingly, the government's second rationale for invoking section 3293(2) is likewise without substance.

IV. <u>The government's position on the limitations statute as to the securities fraud counts, Counts 9 and 10.</u>

On Counts 9 and 10, the statute of limitations is six years.  18 U.S.C. § 3301; Court's Final Instructions, at 78.

As will be demonstrated in his Memorandum in Support of New Trial Motion, Flannery's testimony that McKelvy owed a duty of disclosure to the investors of the fact and amount of his commissions was false.  As such, the allegations in the indictment's overt acts, including overt acts nos. 52, 53, and 54, the three overt acts concerning McKelvy's receipt of wire transfers of "undisclosed fees" which occurred within six years of the date of the indictment – were not a part of a securities fraud scheme because, contrary to Flannery's testimony, McKelvy did not have a duty to disclose such commissions to the investors. Other than these three overt acts, the only other overt act charged which comes fewer than six years before the indictment date of September 2, 2015, is overt act no. 55, the form sent to investors by Wragg and/or Knorr on or about

November 20, 2009; there was no evidence, however, of any involvement by McKelvy in the creation or distribution of this form.

V. <u>The government has offered no evidence from which the jury could infer that there was an "overall" conspiracy, wire fraud scheme, and/or securities fraud scheme involving McKelvy and Knorr</u>. As McKelvy argued in his Motion to Dismiss for Failure to State an Offense, and supporting Memo, Doc. No. 111, where there are demonstrably "two layers" of the fraud, the government has to allege and prove an "overall" conspiracy or an "overall" fraud scheme. <u>United States v. Dobson</u>, 419 F.3d 231, 237 (3d Cir. 2005). This Court properly instructed the jury, on the <u>Dobson</u> "overall" fraud scheme issue, as a part of three instructions – page 41, 53, and 67.

At trial, there was substantial documentary evidence, in the form of scores of emails and other supporting documents, that Wragg repeatedly lied to McKelvy and others the business successes of Mantria. Wragg told McKelvy of the multiple sales of its land by Mantria in Tennessee, of the supposedly independent appraisals showing that the land was worth millions of dollars, and of Mantria's repeated successes in obtaining letters of intent, worth millions of dollars, for green energy products. The documentary evidence is clear - Wragg was defrauding McKelvy, just as Wragg was defrauding the investors.

The government, however, has offered not a shred of evidence that McKelvy was involved in an "overall" conspiracy or "overall" scheme as those terms are used in <u>Dobson</u>.[12]

VI. <u>Conclusion</u>. Accordingly, McKelvy argues that, as a matter of law, judgements of acquittal should be granted on Counts 1-8 for violations of the statute of limitations. In addition, McKelvy argues that judgements of acquittal should be granted on

---

[12] As discussed in McKelvy's new trial motion, attorneys' arguments are not evidence. The government's claim in its closings that Wragg and McKelvy jointly created the numerous emails, daily sales reports, and appraisals – all providing fraudulent information to McKelvy about Mantria's supposed business successes – as a means of concocting a "paper trail" for "plausible deniability," was mere rhetoric, lacking even the pretense of a factual foundation.

**Counts 1-9 and on the fraud allegations in Count 10, for a total lack of evidence of McKelvy's participation in an "overall" scheme.**

                                    **Respectfully submitted,**

                                    **/s/ Walter S. Batty, Jr.**
                                    **Walter S. Batty, Jr., Esq.**
                                    **101 Columbia Ave.**
                                    **Swarthmore, PA  19081**
                                    **(610) 544-6791**
                                    **PA Bar No. 02530**
                                    **tbatty4@verizon.net**

                                    **/s/ William J. Murray, Jr.**
                                    **William J. Murray, Jr., Esq.**
                                    **Law Offices of**
                                    **William J. Murray, Jr.**
                                    **P.O. Box 22615**
                                    **Philadelphia, PA 19110**
                                    **(267) 670-1818**
                                    **PA Bar No.73917**
                                    **williamjmurrayjr.esq@gmail.com**

**Dated: October 26, 2018**

**CERTIFICATE OF SERVICE**

I hereby certify that I have served by electronic mail a true and correct copy of the foregoing Defendant's Motion for Judgement of Acquittal and supporting Memorandum, upon Assistant U.S. Attorneys Robert J. Livermore and Sarah Wolfe:

>Robert J. Livermore, Esq.
>U.S. Attorney's Office
>615 Chestnut Street
>Philadelphia, Pa 19106
>215-861-8505
>Fax: 215-861-8497
>Email:
>robert.j.livermore@usdoj.gov
>
>Sarah Wolfe, Esq.
>U.S. Attorney's Office
>615 Chestnut Street
>Philadelphia, Pa 19106
>215-861-8505
>Fax: 215-861-8497
>Email:
>SWolfe@usa.doj.gov
>
>*/s/ Walter S. Batty, Jr.*
>Walter S. Batty, Jr.

Dated: October 26, 2018